### The SKYDIVING CENTER OF GREATER WASHINGTON, D.C., INC., et al.

### v.

### ST. MARY'S COUNTY AIRPORT COMMISSION, et al.

#### Civ. No. JFM–92–1012.

U.S. District Court,
D. Maryland.

April 16, 1993.

---

Harvey Jacobs, Joyce and Jacobs, Washington, DC, for plaintiffs.

William J. Chen, Jr., Chen, Walsh & Tecler, Rockville, MD, and Nicholas Hamner Cobbs, Washington, DC, for defendants.

## MEMORANDUM

MOTZ, District Judge.

The Skydiving Center of Greater Washington, D.C., Inc. ("the Skydiving Center") and Cynthia and Kevin Gibson have brought this action against the St. Mary's County Airport Commission ("Airport Commission" or "Commission") and the Board of St. Mary's County Commissioners ("County Commissioners"). Plaintiffs assert various claims arising from actions taken by defendants to prevent plaintiffs from conducting parachuting jumps at the St. Mary's County Airport. Numerous motions are pending, including a motion for partial summary judgment filed by plaintiffs and a motion to dismiss or for summary judgment filed by defendants.

### I.

#### A.

The Skydiving Center is a Maryland corporation which operates a skydiving school at the St. Mary's County Airport. Cynthia Gibson is the president and majority shareholder of the Skydiving Center. She holds the top rating given by the United States Parachute Association ("USPA"), is a former national skydiving champion, a two-time world skydiving record holder and has successfully completed over three thousand parachute jumps. She devotes all of her time to running the operations of the Skydiving Center. Kevin Gibson, her husband, is the vice-president and minority shareholder of the Skydiving Center. Like Mrs. Gibson, he holds the top rating given by the USPA and has successfully completed over three thousand parachute jumps. He also holds an FAA student pilot certificate. He works part-time at the Skydiving Center.

The Airport Commission is a commission established to regulate the St. Mary's County Airport. The Commission is comprised of seven part-time volunteers, most of whom have substantial aviation experience. The County Commissioners are the governing body of St. Mary's County and constitute a municipal corporation under Maryland law. Md.Ann.Code, Art. 25 § 1 (1992 Cum.Supp.).

On April 10, 1990, the Airport Commission voted to enter into a five year lease with the Skydiving Center. Plaintiffs were permitted to commence operations in June 1990 notwithstanding the fact that they had not yet actually entered into a lease. On September 22, 1990, the County Commissioners signed the lease. Under the lease the Skydiving Center agreed, *inter alia*, to comply "with all Federal, State, or Local Laws, County or local ordinances, rules or regulation, now or hereafter in force, which may be applicable to the operation of its business at the Airport." According to defendants, one of the rules promulgated by the Airport Commission restricted the area in which skydivers were permitted to land.[1]

#### B.

Shortly after the Skydiving Center commenced its operations, the Airport Commis-

---

1. Plaintiffs dispute that the Airport Commission ever properly delineated the designated landing area. However, since I am ruling in favor of plaintiffs on the legal issues as to which this fact relates, I will assume that defendants' factual assertion is correct.

sion began to receive complaints about skydiving activities. These complaints included allegations that skydivers had been landing outside of the designated landing area, that they had failed to use strobe lights after sunset and that they had jumped through clouds and in other ways dangerous to aircraft using the airport's runways. The complaints resulted in the Commission sending a memorandum to the Skydiving Center on November 19, 1990 notifying it that it was failing to comply with lease requirements and directing it to cease all night skydiving operations. However, at a meeting on January 8, 1991, the Airport Commission (at the request of Mr. Gibson) agreed to remove this night restriction from proposed rules which the Commission was considering, provided that the rules and regulations on lighting were observed.

Over the next several months, as evidenced by reports referred to in the Airport Commission's regular monthly meetings, "out-field landings" occasionally occurred. It was not until the Commission's May 14, 1991 meeting, however, that the minutes reflect any special concern about these landings. At that meeting Tony Tiburzi, the owner of an adjacent property, spoke from the audience, complaining that a skydiver had been injured while landing on his driveway the past weekend. Tiburzi further stated that this was the third time in the past five weeks that someone had landed on his field, that he deserved his privacy and that he did not want skydivers disturbing animals that he kept on his property. Mr. Gibson replied that although he could not guarantee that jumpers would never again land on Tiburzi's property, he would advise the skydivers of Tiburzi's concern and try to work out a resolution of the problem.

At the Commission's next meeting, held on June 11, 1991, Tiburzi again appeared and said that jumpers were still landing on his property and that he wanted the Commission to have them stopped. He and his wife continued to complain about the skydivers throughout the remainder of the year. On one occasion Tiburzi read a petition with 120 signatures calling for the Airport Commission to rescind the Skydiving Center's lease.

He also stated that he was putting up no-trespass notices and that he would have skydivers who landed on his field arrested for trespassing. At a later meeting he lamented that he had been advised by the police that the skydivers could not be arrested for trespassing "due to a technicality in that skydivers cannot read 'no trespass' signs while landing."

Although the minutes of the Commission's meeting reflect that Tiburzi was perhaps the most consistent critic of the Skydiving Center, other persons registered complaints about its operations as well. In August 1991 Mrs. Gibson reported that she had met with one Mary Helen Bowles concerning a "mishap" which had occurred on Mrs. Bowles' property but that Mrs. Bowles had not reported any problems concerning the skydivers and had not requested any compensation for damage to her property. At the end of the meeting Mrs. Bowles rose to dispute what Mrs. Gibson had said, explaining that she had not asked for any compensation because she did not yet know what damage had been done. Other persons, including the president of Quik–Aero, the Fix Based Operator at the airport, wrote letters and memoranda to Commission members complaining about off-field landings and other skydiving activities. In response, the Commission wrote to the Skydiving Center requiring it to submit reports about each off-field landing. Tensions escalated to the point that the Gibsons consulted their lawyers, and, at the Airport Commission meeting held on September 10, 1991, Mrs. Gibson, on the advice of counsel, refused to respond to a complaint about an alleged off-field landing. She said that any future complaints should be submitted in writing to the Skydiving Center.

The Commission reported at its November 12, 1991 meeting that the Federal Aviation Administration ("FAA") was investigating the off-field landings problem. According to an internal FAA memorandum dated December 6, 1991, the FAA had been monitoring skydiving operations at the St. Mary's County Airport ever since the Skydiving Center had begun its operations and had handled numerous complaints filed by various persons regarding the conduct of those operations.

The memorandum further reflects that FAA safety inspectors had participated in several meetings, characterized as "very thorough and comprehensive," with members of the local community, the Airport Commission and the Skydiving Center about skydiving operations and that the results of a safety inspection at the airport conducted on November 21, 1991 were satisfactory. The report concluded by stating that the FAA would conduct further surveillances at the airport and it would continue its investigation.

### C.

On December 3, 1991, the County Commissioners wrote to the Airport Commission. The letter stated as follows:

Dear Commission Members:

For several months we have observed the many reports of public concern relative to the skydiving operation at the County Airport. We believe the heightened public concern and apparent ongoing safety question needs definite response.

When we met with you at the airport on October 29, 1991 you informed us of the pending inspection by the Federal Aviation Administration. We understood the inspection will result in an analysis of the skydiving operation in terms of conformance with normal airport operations and of adherence to accepted safety practices. It appears such an inspection and analysis will require a considerable amount of time.

We do not believe a decision on the compatibility of the skydiving activity with the airport operation and its planned expansion should be delayed much longer. Accordingly, we request a timetable from you within which there will be a resolution of the problems associated with the skydiving activity.

Thank you for your timely attention to this matter.

George Haliscak, the chairperson of the Airport Commission, announced at the Commission's December 10, 1991 meeting that the Commission had received this letter and that the Commission would be sending a letter outlining specific actions which the Skydiving Center would be required to take to resolve the problems at the airport. The following day the letter was sent.

On February 12, 1992, the Airport Commission sent a memorandum to the County Commissioners responding to their December 3rd letter. The memorandum stated as follows:

In response to your letter dated December 3, 1991, the Airport Commission, in Executive Session, by unanimous agreement of those present, has decided to withdraw any implicit or explicit permission to The Skydiving Center of Greater Washington, D.C., Inc. to parachute jump over or onto St. Mary's County Airport in accordance with FAR Regulation 105.17 (Encl. 1). The airport control zone is designated as an area within a three nautical mile radius from the center of the airport. It is of note that the second paragraph of Page 2 of The Skydiving Center of Greater Washington, D.C., Inc.'s letter of February 11, 1992 (Encl. 2) states "There is no language in ·The Skydiving Center's lease with the county that requires skydivers to land in areas designated by the Airport Commission. Nowhere in the lease are parachute landings mentioned."

· Unless otherwise directed by the Board of County Commissioners, 15 days from the date of this letter, the Airport Commission will inform The Skydiving Center of Greater Washington, D.C., Inc. of its decision, with implementation 30 days after that notification. The decision is made to ensure the future safety of operations at the St. Mary's County Airport.

The Skydiving Center had not been given any notice of the executive session of the Airport Commission referred to in this memorandum. On March 10, 1992, the Commission conducted its regular public monthly meeting. Again, the Skydiving Center was not given any notice prior to the meeting that the Commission would consider, decide or announce any decision to prohibit the Skydiving Center from conducting parachute jumps at the airport. Nevertheless, at the end of the meeting, when "new business" was to be discussed, one of the Commission members made a motion that the Commission

amend the airport's rules and regulations to prohibit parachute operations over and onto the airport (unless the Commission gave written permission for special events such as exhibitions or air shows).

Various persons spoke in favor of the motion, including four of the five Commissioners present. They did not disclose that they had already voted to prohibit jumping at the airport at their executive session held a month earlier or that they had already notified the County Commissioners of their decision. Three of them gave their "personal feelings" or stated their own observations. A fourth said he believed the motion should be passed for the reason that "every month the main topic of discussion is the problems with the Skydiving Center and that half the meeting is spent on trying to resolve the issues."

In opposing the motion, Mr. Gibson stated that "an independent organization should make the determination as to whether the Skydiving Center should be allowed to remain on the airport." William Spangler, another representative of the Skydiving Center present at the meeting, stated that "the Skydiving Center would like the chance to have an uninterested party come in and observe the situation and have an accurate assumption [sic] of the safety concerns, and then make a determination on that standpoint." Nevertheless, the motion was brought to a vote and was approved unanimously. Mr. Gibson protested, imploring the Commissioners to remember that it is "[our] livelihood ... [you are] talking about."

On March 13, 1992, the Airport Commission wrote to the Skydiving Center "to officially confirm the motion passed at the Airport Commission Meeting on March 10, 1992." The letter concluded by stating "The revocation shall take effect 30 days from the date of the Airport Commission's decision, which shall be April 9, 1992." A copy of the letter was sent to the County Commissioners and to Joseph R. Densford, the County Attorney.

On March 24, 1992, the County Commissioners held one of their regular meetings. Mrs. Gibson appeared before the Commissioners and requested that (1) the Commissioners direct the Airport Commission to amend or rescind the motion which it adopted at its March 10th meeting, (2) the Commissioners "not take any action until an investigation be conducted and airing of the Skydiving Center's responses to compatibility and safety allegations by the Airport Commission," and (3) the Commissioners "take steps to remedy the bad faith treatment by the Airport Commission with the Skydiving Center." Mrs. Gibson stated that she had just received a letter from the FAA indicating that the Skydiving Center had not committed any safety violations and saying that the FAA's investigation may continue. She asked that the Commissioners stay any action against the Center until the FAA had completed its investigation.

After discussion a motion was passed which, rather than implementing Mrs. Gibson's requests, merely asked the Airport Commission to respond to the FAA's letter, to provide the Skydiving Center with a list of safety concerns and to respond to the allegations by the Skydiving Center. One of the County Commissioners had suggested during the course of the discussion that the Airport Commission "may want to grant an extension beyond the April 9 deadline" but the suggestion was not included in the motion which was passed.

### D.

On April 9, 1992, plaintiffs filed this action. On April 23, 1992, a hearing was held on a motion to dismiss filed by defendants and a motion for preliminary injunction filed by plaintiffs. The following day this court entered an order denying defendants' motion to dismiss and granting plaintiffs' motion for a preliminary injunction.

In September 1992 the FAA completed its study and investigation of the compatibility of skydiving with other aeronautical uses at the St. Mary's County Airport. The FAA found that:

> [G]iven the type and relatively low activity at the airport, parachute jumping is currently a compatible use at the St. Mary's County Airport. The action taken by the Airport to rescind The Skydiving Center's right to jump on the airport appears to be

unjustified at this time. However, parachute jumping does present a potential safety hazard calling for close monitoring of future activity and the need for establishment and enforcement of reasonable rules and regulations by the Airport Commission commensurate with this activity. The Airport should work with the Skydiving Center to establish clear rules and regulations in the interest of public safety and welfare and an understanding of the penalties for deviating from those rules. Both the Flight Standards District Office and our office are willing to meet with County officials and the Skydivers to establish such rules and regulations.

Further, the FAA concluded that the "mere fact that parachute jumpers occasionally missed the drop zone, in itself, is not evidence that skydiving at St. Mary's County Airport is incompatible with other airport activity or otherwise supports the Airport's action to rescind the Skydiver's right to jump." On November 10, 1992, the Airport Commission rescinded its March 10, 1992 ban on skydiving at the airport.

## II.

 Plaintiffs assert a claim under 42 U.S.C. Section 1983, contending that defendants deprived them of due process of law by prohibiting them, without prior notice or an opportunity to be heard, from skydiving at the St. Mary's County Airport. Defendants concede that the Skydiving Center has a constitutionally cognizable property interest.[2] They assert, however, that the Skydiving Center's Section 1983 claim fails because (1) the Center was afforded all of the process to which it was due, and (2) the County Commissioners never approved the amendment to the airport rule adopted by the Airport Commissioners banning parachute jumps at the airport. Neither argument is meritorious; the Skydiving Center is therefore entitled to partial summary judgment against the County Commissioners as to the issue of liability on the Section 1983 claim.

### A. The Constitutional Adequacy of the Decision–Making Process

It is elementary that the due process clause of the Fourteenth Amendment usually requires that before depriving a person of a property right, a governmental body must give that person prior notice and an opportunity to be heard. See, e.g., Zinerman v. Burch, 494 U.S. 113, 127, 110 S.Ct. 975, 984, 108 L.Ed.2d 100 (1990) (cases cited therein).[3]

---

**2.** Plaintiffs also contend that parachute jumping falls within the right to travel protected by the Fourteenth Amendment. The only authority which they cite in support of this proposition is *Shapiro v. Thompson,* 394 U.S. 618, 629, 89 S.Ct. 1322, 1328, 22 L.Ed.2d 600 (1969), which struck down state statutes establishing waiting periods for the receipt of welfare benefits. I am unpersuaded that the Constitution should be trivialized as plaintiffs suggest. Thus, since the Gibsons were not parties to the Skydiving Center's lease and have no cognizable property right under the lease, their Section 1983 claim fails.

Five others claims asserted by plaintiffs may be summarily disposed of.

(1) There is no direct constitutional claim, either for a denial of due process or an infringement of the right to travel, against a local municipality under the U.S. Constitution. *See, e.g., Weller v. Department of Social Services,* 901 F.2d 387, 398 (4th Cir.1990); *Cale v. City of Covington,* 586 F.2d 311, 313 (4th Cir.1978).

(2) There is no private right of action under 49 U.S.C.App. Section 2210. *See, e.g., New England Legal Foundation v. Massachusetts Port Auth.,* 883 F.2d 157, 168 (1st Cir.1989); *Western Airlines, Inc. v. Port Auth. of New York and New Jersey,* 817 F.2d 222, 225 (2nd Cir.1987), *cert.*

denied, 485 U.S. 1006, 108 S.Ct. 1467, 99 L.Ed.2d 697 (1988); *Arrow Airways, Inc. v. Dade County,* 749 F.2d 1489, 1491 (11th Cir.1985).

(3) Defendants are not federal agencies within the meaning of the federal Administrative Procedures Act and are therefore not subject to the requirements of the APA. *See, e.g., Munoz–Mendoza v. Pierce,* 711 F.2d 421, 430 (1983); *City of Rohnert Park v. Harris,* 601 F.2d 1040, 1048 (9th Cir.1979), *cert. denied,* 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980).

(4) Defendants are not "executive agencies" and therefore are not covered by the Maryland Administrative Procedures Act. Md.State Gov't Code Ann. § 10–102(a) (1984).

(5) Plaintiffs have no viable claims for punitive damages either under 42 U.S.C. Section 1983, *see City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 268, 101 S.Ct. 2748, 2760, 69 L.Ed.2d 616 (1981), or under Maryland law for breach of contract. Md.Cts. & Jud.Proc.Code, §§ 5–322 to 5–324 (1992 cum. supp.); *See Miller Building Supply, Inc. v. Rosen,* 305 Md. 341, 503 A.2d 1344, 1347 (1986).

**3.** It is well established that a corporation is a "person" within the meaning of the Due Process clause of the Fourteenth Amendment, *see, e.g.,*

Here, the Skydiving Center was afforded neither.

■■■ As the undisputed factual record establishes, the Airport Commission decided to strip the Skydiving Center of its right to conduct parachute jumps at the airport at a closed executive session. The Airport Commission advised the County Commissioners of this decision by a memorandum dated February 12, 1992 but did not communicate it to the Skydiving Center. Instead, the Commission went through the charade of conducting a "hearing" on the matter at its March 10, 1992 meeting. Even before this meeting the Commission did not advise the Skydiving Center that the revocation of its rights (which in fact had already been decided) would be discussed at the meeting.[4] It is true that representatives of the Skydiving Center were given the opportunity to speak at the meeting. However, of the five commissioners present (all of whom voted in favor of the ban), four spoke out and made it clear that they had already made up their minds how to vote. Three said they were basing their decision upon their own personal feelings and observations and the fourth simply was tired of dealing with the disputes that had arisen between the Skydiving Center and some of the members of the community.[5] The suggestion made by representatives of the Skydiving Center that a decision be postponed until an independent, disinterested agency had investigated the matter went unheeded, as did Mr. Gibson's plea that the members of the Commission remember that they were talking about the Gibsons' livelihood. These facts speak for themselves. A greater abuse of procedural due process can hardly be imagined.

*Metropolitan Life Ins. Co. v. Ward,* 470 U.S. 869, 881 n. 9, 105 S.Ct. 1676, 1683 n. 9, 84 L.Ed.2d 751 (1985); *Grosjean v. American Press Co.,* 297 U.S. 233, 244, 56 S.Ct. 444, 446, 80 L.Ed. 660 (1936), and that a corporation may vindicate its constitutional rights by suing under Section 1983. *See, e.g., South Macomb Disposal Authority v. Township of Washington,* 790 F.2d 500, 503 (6th Cir.1986); *California Diversified Promotions, Inc. v. Musick,* 505 F.2d 278, 283 (9th Cir.1974).

4. Defendants point out that complaints about the Skydiving Center's operations had been a frequent topic of conversation at the Airport Commission meetings. However, knowledge that

**B.** *The Respective Powers of the Airport Commission and the County Commissioners*

■■■ As a threshold matter, defendants contend that the Airport Commission is not a proper defendant because it is only the Board of County Commissioners, not the Airport Commission, which is a cognizable legal entity. This contention is well founded. *See Revene v. Charles County Commissioners,* 882 F.2d 870, 875 (4th Cir.1989). However, resolution of this technical point is only the starting point for analyzing the County Commissioners' underlying contention: that the County Commissioners (as the legally cognizable entity constituting St. Mary's County under Maryland law) cannot be held liable under Section 1983 for the parachute jumping ban because the Airport Commission did not have the authority to impose the ban and the County Commissioners, who did have the authority, never approved the ban.

Given the history of what has occurred, the County Commissioners' position is, to put it most charitably, surprising. What they now assert—for the first time—is that under Section 151–10 of the St. Mary's County Code, the County Commissioners have not delegated to the Airport Commission, but have reserved for themselves, the power to regulate uses of the county airport. Section 151–10 provides in relevant part as follows:

§ 151–10. Powers and duties.

The Commission shall have the following powers, duties and responsibilities:

A. The Board of County Commissioners expressly grants unto the Commission all those powers and authority avail-

such complaints had been lodged in the past did not constitute notice that the Commission planned to act on the complaints by banning skydiving at the airport (or that it had, in fact, already made the decision to do so).

5. Defendants have submitted affidavits from individual Commission members stating, *inter alia,* that they serve on the Commission as volunteers solely out of a sense of civic duty. It may be assumed that this is true. However, having accepted public office, the Commissioners are bound to act in accordance with the Constitution and to respect the rights of people whose lives they affect.

able to said Commission under the authority of the Transportation Article, Title 5, of the Annotated Code of Maryland. It is the Board's intention to exercise all those powers allowing to the county under said Transportation Article, Title 5.

\* \* \* \* \* \*

D. The Commission, subject to the approval of the County Commissioners, shall have full power and authority to enter into, execute and enforce any leases, contracts or concessions pertaining to any building, facility and/or land of the St. Mary's County Airport. All leases, contracts or concessions must be prepared and approved by the County Attorney.

The County Commissioners argue that under the last section of subsection (A) they stated their intention to retain for themselves all powers conferred upon the County under the Maryland Transportation Code. They further argue that under subsection (D) they reserved the right to approve any decisions made by the Airport Commission concerning any leases, contracts or concessions. They allege that their understanding of the ordinance is confirmed by the fact that when the airport's rules and regulations were first adopted in the summer of 1987, the Airport Commission proposed them and the County Commissioners approved them, stipulating in the minutes of approval that "any amendments must be approved by the Board [of County Commissioners]."

I have substantial question as to whether the County Commissioners are interpreting Section 151–10 correctly. They ignore the first sentence of subsection (A) which expressly grants to the Airport Commission all those powers and authority that could be granted to the Commission under the Maryland Transportation Code. Although it would have made more sense for the second sentence of Subsection (A) to precede the first, the clear meaning of the two sentences, when read together, is that the County Commissioners are (under the second sentence) exercising all of the powers that they are granted under the Transportation Code and that they are (under the first sentence) dele-

gating those powers to the Airport Commission to the extent they can do so under the Code. Since nothing in the Code prohibits the Airport Commission from adopting rules and regulations, that power was delegated to the Commission. As to subsection (D), assuming that it implicitly reserved to the County Commissioners the power to approve lease terminations (as opposed to the power to execute and enforce leases expressly mentioned in the subsection), the County Commissioners ignore the fact that the ban on parachute jumping was not accomplished by terminating the Skydiving Center's lease but by amending the rules and regulations at the airport. Subsection (D) does not render such amendments subject to the County Commissioners' approval.

If Section 151–10 does constitute a delegation to the Airport Commission of the power to adopt rules and regulations at the airport, the County Commissioners' stipulation to the adoption of the rules and regulations in 1987 that any subsequent amendments must be approved by them may well have been *ultra vires.* In any event, whatever the niceties of Maryland law might be, it is clear that, as a matter of fact, the County Commissioners directed and authorized the Airport Commission to act in connection with the skydiving ban and at least implicitly ratified its decision.

As set forth above, in early December 1991 the County Commissioners wrote a letter to the Airport Commission expressing concern regarding public complaints about the skydiving operation at the County Airport and the length of time that a pending FAA inspection would take. They therefore requested "a timetable from you within which there will be a resolution of the problems associated with the skydiving activity." In response, at a closed executive session, the Airport Commission determined to prohibit the Skydiving Center from conducting parachute jumps over or onto the airport, and it communicated this decision to the County Commissioners by a memorandum dated February 12, 1992. The memorandum concluded by stating that "Unless otherwise directed by the Board of County Commissioners, 15 days from the date of this letter, the

Airport Commission will inform the Skydiving Center ... of its decision, with implementation 30 days after that notification." The County Commissioners never "otherwise directed" the Airport Commission. After it publicly adopted the jumping ban at its March 10, 1992 meeting, the Airport Commission wrote to the Skydiving Center formally advising it of the ban, stating that the ban would become effective 30 days from the date of the Airport Commission's decision on April 9, 1992. Copies of the letter were sent to the Board of Commissioners and the County Attorney. Again, the County Commissioners said or did nothing to indicate that they believed that the ban was not effective.

The County Commissioners did consider the matter at their March 24, 1992 meeting. According to the minutes of that meeting, Mrs. Gibson appeared before the County Commissioners and requested them, *inter alia*, to "direct the Airport Commission to amend or rescind" the ban. None of the County Commissioners suggested that this request was inappropriate because Mrs. Gibson was asking for revision of a ban that they had not yet approved. To the contrary, as is reflected by the fact that one of the County Commissioners suggested that the Airport Commission "may want to grant an extension beyond the April 9 deadline," the County Commissioners themselves assumed that no further approval was required. At the conclusion of their discussion, the County Commissioners did nothing to rescind the ban or express their disapproval of it. Nor did they act upon a request made by Mrs. Gibson that they stay action against the Center until the FAA had completed its investigation. Instead, they merely adopted a bland motion asking the Airport Commission to respond to the FAA's letter and to provide the Skydiving Center with a list of safety complaints and a response to its allegations.

Even after this lawsuit was filed, the County Commissioners never took the position (until it filed the motions now under consideration) that the ban had not yet gone into effect because they had not approved it. To the contrary, they argued that the Airport Commission "had the right and obligation to enact regulations to protect the safety of all users of the St. Mary's County Airport," *see* Defendants' Motion to Dismiss at p. 13, and that "the balance of hardship in this case clearly favors the defendants [including the County Commissioners], who have taken actions to protect the safety of the entire airport community." *See* Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction at p. 9.

Against this background the County Commissioners' present effort to disavow the skydiving ban is clearly discernable as the sheer sophistry that it is. The Airport Commission and the County Commissioners spoke for the County in adopting the ban, and the County is therefore responsible for their actions under Section 1983. *See, e.g., Pembaur v. City of Cincinnati,* 475 U.S. 469, 480–81, 106 S.Ct. 1292, 1298–99, 89 L.Ed.2d 452 (1986).

### III.

Plaintiffs also argue that various restrictions placed by defendants upon their skydiving operations are preempted by federal law. The Airport Commission has now rescinded the flat prohibition against parachute jumping at the airport. However, the preemption issue continues to pervade the contract claims that the parties assert against one another.

■ Federal preemption can be accomplished in three ways. First, Congress can expressly preempt state regulation. Second, by regulating an area in a comprehensive fashion, Congress can implicitly preempt local laws. Third, where Congress does not occupy a field so comprehensively as to prohibit entirely state regulation, a state regulation that conflicts with a federal regulation is preempted. *See Northwest Central Pipeline Corp. v. State Corp. Comm'n of Kansas,* 489 U.S. 493, 509, 109 S.Ct. 1262, 1273, 103 L.Ed.2d 509 (1989); *Michigan Canners & Freezers Ass'n, Inc. v. Agricultural Marketing And Bargaining Board,* 467 U.S. 461, 469, 104 S.Ct. 2518, 2522–23, 81 L.Ed.2d 399 (1984).[6]

6. *City of Burbank v. Lockheed Air Terminal, Inc.,* 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547

The FAA has issued a series of regulations applicable to parachute jumping. *See* 14 C.F.R. Part 105. These regulations govern a broad range of activities, including the obtaining of prior approval before jumping over or onto airports, night jumps, visibility requirements and parachute equipment. Moreover, because St. Mary's County Airport receives federal funds, regulations which the FAA has issued pursuant to the Airport and Airway Improvement Act, 49 U.S.C.App. Sections 2201 et. seq. (1988 & Supp. II (1990)), are applicable to it. Under the Act airports receiving federal funds must make themselves open to all aeronautical users on a nondiscriminatory basis, *id.* at § 2210(a), and one of the directives which the FAA has issued delineates participating airports' obligations toward parachute jumping operations.[7] FAA Airport Compliance Requirements Order 5190.6A, § 4–8(b), p. 17 (October 2, 1989).

Order 5190.6A provides in relevant part:

*b. Parachute Jumping.* Parachute jumping is an aeronautical use and requests to airport owners from parachute jumping clubs, organizations, or individuals to establish a drop zone within the boundaries of an airport should be evaluated on the same basis as other aeronautical uses of the airport. Any restriction, limitation, or ban against parachute jumping on the airport must be based on the grant assurance which provides that the sponsor may prohibit or limit an aeronautical use "for the safe operation of the airport or when necessary to serve the civil aviation needs of the public" (see paragraph 4–8a). Among the reasonable limitations on parachute jumping that an airport owner might require are:

(1) The airport owner designate reasonable time periods for jumping and specific areas for drop zones.

(2) Jumpers (or requesting organization) agree to pay a reasonable fee that is not unjustly discriminatory.

(3) Jumpers hold a general liability insurance policy that names the airport owner as an additional ensured party, with the amount of insurance to be reasonable and not unjustly discriminatory. The airport owner is not required to permit this activity if, in his judgment, it creates a safety hazard to the normal operations of aircraft arriving or departing from the airport, nor is the airport owner required to close the airport to provide a safe environment for the parachute jumpers. In cases where complaints are filed with FAA, Flight Standards and Air Traffic should be consulted to help determine the reasonableness of the airport owner's restrictions. It may be appropriate to initiate an FAA airspace study to determine the efficiency and utility of the airport when considering the proposed restriction. In all cases the FAA will make the final determination of the reasonableness of the airport owner's

(1973) is a landmark preemption decision in the field of aviation law. There, the City of Burbank had adopted an ordinance that set curfew hours during which airplanes were prohibited from taking off from the Hollywood–Burbank Airport. Relying, as do plaintiffs in this case, on 49 U.S.C. §§ 1348(a) and (c) and § 1508(a), in addition to the Noise Control Act of 1972, the Supreme Court found the local ordinance preempted. The Court reasoned that considerations of safety, efficiency and protection of persons "requires a uniform and exclusive system of federal regulation if the congressional objectives underlying the Federal Aviation Act are to be fulfilled." 411 U.S. at 639, 93 S.Ct. at 1862. Shortly after the *Burbank* decision, Congress passed 49 U.S.C.App. § 1305, which clarified and codified *Burbank.*

7. Defendants seek to distinguish *Blue Sky Entertainment, Inc. v. Town of Gardiner,* 711 F.Supp.

678 (N.D.N.Y.1989), which found certain restrictions imposed by a municipality to be preempted by federal law, on the ground that the municipality had adopted the restrictions in the exercise of its police powers rather than as an airport proprietor. There are some respects in which a local government has broader regulatory powers in the aviation field in its capacity as the owner of an airport than it would under its general police powers. *See, e.g.,* 49 U.S.C. Section 1305(b); *Alaska Airlines, Inc. v. City of Long Beach,* 951 F.2d 977, 982 (9th Cir.1991); *Blue Sky,* 711 F.Supp. at 691, n. 14. However, those powers have never been deemed to be broad enough to authorize a municipality to adopt restrictions which are in direct conflict with FAA regulations. Moreover, if the municipality is the owner of a federally funded airport, it must exercise its proprietary powers in accordance with Order 5190.6A.

restrictions which denied or restricted use of the airport.

■■■■ Against the background of this regulatory scheme it is clear that, as the Airport Commission itself has apparently now recognized, its prohibition against all parachute jumping at the St. Mary's County airport is preempted in the wake of the FAA's September 9, 1992 compatibility study. Similarly, defendants' argument that occasional off-site landings constitute a material breach of the Skydiving Center's lease fails on preemption grounds in light of the finding made by the FAA, as stated in the September 9, 1992 report: "The mere fact that parachute jumps occasionally miss the drop zone, in itself, is not evidence that skydiving at St. Mary's County Airport is incompatible with other airport activity or otherwise supports the Airport's action to rescind the skydiver's right to jump." [8] This finding constitutes a "final determination" by the FAA under Order 5190.6A of the unreasonableness of any attempt by defendants to require that all jumpers land within the confines of the area which the Airport Commission contends it has designated.[9]

## IV.

Plaintiffs have sought leave to amend their complaint to assert claims against George Haliscak for having allegedly engaged in various harassing activities interfering with the Skydiving Center's contract rights under its lease at the airport.[10] The motion will be denied. Some of the allegations against Haliscak, such as statements which he made to the FAA, constituted no more than the exercise of his First Amendment rights. To the extent that he is alleged to have engaged in other conduct that might give rise to a cause of action, his acts are not, in light of the rulings that I have made in the Skydiving Center's favor on the summary judgment motions, sufficiently related to the facts that remain to be decided to warrant the exercise of this court's supplemental jurisdiction under 28 U.S.C. Section 1367.

The County Commissioners have moved to amend their counterclaim. to assert a claim that the Skydiving Center is not carrying liability insurance meeting the requirements of the lease. The motion will be granted. However, the County Commissioners' related motion that they be granted summary judgment on the issue of the adequacy of the Skydiving Center's insurance will be denied. Additional facts must be developed on that issue, such as (1) whether the County Commissioners waived their right to insist upon insurance meeting the literal terms of the lease, (2) whether such insurance is available in the market and (3) if not, whether the FAA would find the insurance requirements

---

**8.** The record establishes that the Airport Commission itself has always known that. parachute jumpers cannot always land in a designated area. Commissioner Haliscak admitted on deposition that "we understand that some landings may be out of the drop zone." Moreover, in a memorandum which he wrote to Haliscak on August 8, 1991, Stuart Fitrell, who was then a member of the Airport Commission, recounted a conversation which he had with Mr. Gibson in which Mr. Gibson "wondered whether we would consider removing the clause that requires him to confine all jumps to the airport property from the lease at renegotiation time. I said 'no way', that is our way out if it ever becomes necessary. He countered with saying that it wouldn't hold up in court because it is unreasonable." Fitrell then added in words that may have been prophetic: "I did not counter; but even if he's right, we could close them down until we were overturned in court, that would take a couple years, and they are not financially strong enough to absorb that length of delay."

**9.** It should perhaps be noted that my holding that Order 5190.6A has preemptive effect is not inconsistent with my ruling that plaintiffs have no private right of action under 49 U.S.C.App. Section 2210. See footnote 2, supra. A preemption claim may be asserted under the Supremacy Clause even if the federal statute, with which the state law conflicts, does not provide for a private cause of action. See, e.g., Western Airlines, Inc. v. Port Auth. of New York and New Jersey, 817 F.2d 222, 225–26 (2d Cir.1987), cert. denied, 485 U.S. 1006, 108 S.Ct. 1467, 99 L.Ed.2d 697 (1988); Bath Mem. Hosp. v. Maine Health Care Finance Comm'n, 673 F.Supp. 628, 631 (D.Me.1987).

**10.** Plaintiffs have also filed a related motion to show cause why defendants should not be held in contempt for having performed acts preventing or hindering plaintiffs from engaging in skydiving activities at the St. Mary's County Airport in violation of the preliminary injunction issued by this court on April 24, 1992. I will defer ruling upon that motion until a later stage of these proceedings.

in the lease to be reasonable when exercising its review authority under Rule 5190.6A.

A separate order effecting the rulings made in this memorandum is being entered herewith.

### ORDER

For the reasons stated in the memorandum being entered herewith (and, as to rulings 1, 2 and 3, for the reasons stated on the record on April 5, 1993), it is, this 16th day of April 1993

#### ORDERED

1. Defendants' motion to strike plaintiffs' supplement to plaintiffs' opposition to defendants' motion to dismiss, etc. is granted;

2. The United States Parachute Association's motion for leave to file brief as amicus curiae is denied;

3. Plaintiffs' motion to compel discovery is granted;

4. The motion to dismiss filed by the St. Mary's County Airport Commission is granted;

5. The Skydiving Center's motion for partial summary judgment is granted as to the issue of liability on its claim under 42 U.S.C. Section 1983 against the Board of County Commissioners of St. Mary's County ("County Commissioners");

6. The County Commissioners' motion for summary judgment is granted as to the claim of Cynthia Gibson and Kevin Gibson under 42 U.S.C. Section 1983;

7. The County Commissioners' summary judgment motion is granted as to (a) plaintiffs' direct claims under the Fifth and Fourteenth Amendments of the U.S. Constitution; (b) plaintiffs' claim under 49 U.S.C. Section 2210; (c) plaintiffs' claim under the Federal Administrative Procedures Act; and (d) plaintiffs' claim under the Maryland Administrative Procedures Act;

8. The County Commissioners' summary judgment motion is granted as to plaintiffs' claim for punitive damages;

9. The Skydiving Center's motion for partial summary judgment is granted as to the County Commissioners' claim that al-
leged off-field landings constitute a breach of the lease between the Skydiving Center and the County Commissioners entitling the County Commissioners to terminate the lease;

10. Ruling on plaintiffs' motion for order to show cause is deferred until later stage of these proceedings;

11. Plaintiffs' motion for leave to amend the complaint is denied; and

12. Defendant's motion for leave to amend counterclaim is granted.